NOT DESIGNATED FOR PUBLICATION

No. 126,624

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DIANA LOPEZ,
*Appellee*,

v.

NATIONAL BEEF PACKING CO. and
ZURICH AMERICAN INSURANCE CO.,
*Appellants*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Oral argument held July 9, 2024. Opinion filed October 18, 2024. Affirmed.

*Shirla R. McQueen*, of Sharp McQueen, P.A., of Liberal, for appellants.

*Jeff K. Cooper*, of Topeka, for appellee.

Before GREEN, P.J., GARDNER and PICKERING, JJ.

PICKERING, J.: Diana Lopez, a fabrication supervisor at National Beef Packing Co. (National Beef), suffered a torn rotator cuff and myofascial injuries after deboning briskets. After the administrative law judge (ALJ) found Lopez' myofascial injuries work-related but her torn rotator cuff nonwork-related, Lopez appealed to the Workers Compensation Appeals Board. The Board modified the ALJ's order and found both injuries work-related.

On appeal, National Beef makes three claims: (1) The Board's order regarding both of Lopez' injuries was not supported by substantial evidence; (2) Lopez failed to

1

give timely notice of her rotator cuff injury by work accident; and (3) the Board erred in awarding reimbursement of Lopez' unauthorized medical expenses. After reviewing the record, we find no error and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Lopez' Injury*

Lopez was a fabrication supervisor at National Beef. Her job duties included providing supplies to and supervising employees who processed incoming cattle meat. She also assisted the employees processing meat if necessary.

On December 20, 2019, Lopez began helping remove bones from briskets after an employee went on vacation. She testified that she did this job for two weeks on eight-hour shifts. To debone briskets, Lopez had to grab a brisket off a conveyor belt using a hook in her left hand and pull the brisket toward her. She would then use a knife in her right hand to cut the meat from the bone and would toss the bone with her right hand onto an overhead belt.

On January 3, 2020, Lopez reported to her supervisor, Genaro Saenz, that she had pain and tenderness around her right breast and experienced pain when lifting her arms or making sudden movements. Lopez went to the emergency room at Southwest Medical Center that day and reported that she had a lump and pain in her breast for a week, and the lump had grown and moved. She was diagnosed with reactive lymphadenopathy and told to follow up with her primary care provider. Lymphadenopathy is "[a]n enlargement of the lymph nodes, usually associated with disease." The American Heritage Online Medical Dictionary.

On January 6, 2020, Lopez went to her primary care provider and received a note for tendinitis and right shoulder problems. On January 7, 2020, Lopez saw National Beef's physician's assistant Danny Briggs to receive work accommodations for pain and swelling near her right breast. An MRI done on January 10, 2020, showed Lopez had a torn rotator cuff in her right shoulder. Lopez was referred to Dr. Pingal Desai, who advised her that surgery was necessary. Before this episode, Lopez had not experienced shoulder problems.

The following week, on January 14, 2020, Lopez saw Briggs again and discussed her torn rotator cuff. Although Briggs understood the MRI showed a rotator cuff tear, he performed a rotator cuff exam on Lopez and did not detect signs of a rotator cuff tear. Lopez denied having an accident or injury at work. Lopez reported to Briggs that she deboned briskets for a week but did not have pain while working.

On January 21, 2020, Lopez made another visit to Briggs and alleged that her injuries were work-related. Lopez believed her breast pain and rotator cuff tear stemmed from her two weeks of deboning briskets. Lopez claimed that Briggs told her there was "no way" her injury was work-related.

*Medical Evaluations and Application for Benefits*

On February 20, 2020, Dr. David Hufford performed a medical evaluation of Lopez at National Beef's request. During this evaluation, Lopez reported a "gradual and insidious onset of pain about her right lateral rib cage with a reporting date of December 20, 2019." Lopez also reported a rash in that area. Lopez claimed her pain had become "more generalized" in her right shoulder and upper extremity. Dr. Hufford concluded the two weeks Lopez spent deboning briskets were "not consistent with nor sufficient to have caused a rotator cuff tear . . . ." Dr. Hufford also noted Lopez experienced pain consistent

3

with "possible radiculopathy," a condition resulting from a pinched or damaged nerve in the spine.

Dr. Hufford opined that Lopez' "work activities are not consistent with nor sufficient to have caused any direct injury to the cervical spine nor the evolution of radiculopathy in the right upper extremity." He further found that "[t]he occupational component of her condition is no more than simple myofascial pain that may include the pectoralis muscle but is not responsible for her more general and diffuse chest wall and right upper extremity pain . . . ." Dr. Hufford concluded work was not the prevailing factor for Lopez' condition.

On February 25, 2020, Briggs informed Lopez her condition was deemed nonwork-related, and her workers compensation claim was denied. On March 11, 2020, Lopez underwent surgery to repair her rotator cuff using her personal insurance. On March 30, 2020, Lopez applied for workers compensation benefits, alleging that her injuries to her chest and right upper extremity were caused from repetitive activities in deboning brisket. The date of injury was listed as December 20, 2019.

On May 13, 2020, Dr. Pedro Murati performed a medical evaluation of Lopez at Lopez' attorney's request. Lopez reported to Dr. Murati that she deboned briskets for eight hours per day for two weeks. Lopez reported the deboning work involved pushing and pulling 50-pound briskets with a hook and throwing the bone onto another belt. Dr. Murati noted Lopez' surgically repaired rotator cuff and further diagnosed her with "[r]ight occipital neuropathy with headaches" and "[m]yofascial pain syndrome of the right shoulder girdle extending into the cervical and thoracic paraspinals." Dr. Murati explained that Lopez had no hobbies known to cause her conditions, no preexisting injuries, and was asymptomatic before deboning briskets. Therefore, Dr. Murati found within reasonable medical certainty that "multiple repetitive traumas at work" was the prevailing factor for Lopez' injuries.

On December 11, 2020, Lopez amended her application for benefits, citing the date of injury as December 20, 2019, through January 3, 2020. On December 16, 2020, the ALJ denied her request for additional treatment. The ALJ stated: "[Lopez] has failed to prove she is in need of additional treatment at this time. . . . There was apparently some inaccurate information provided to the doctors as to how the activities were performed, that was utilized to determine the prevailing factor."

*Dr. Carabetta's Independent Evaluation*

The ALJ appointed Dr. Vito Carabetta to perform an independent medical evaluation on Lopez. During this evaluation on June 22, 2021, Lopez estimated the briskets she deboned weighed 40 pounds, 50 pounds with the bone in. Lopez reported she deboned briskets "at chest level with a knife in the right hand," requiring "aggressive cutting with that same knife, pushing and pulling and tugging with both of the upper limbs at other times." Lopez said she would then put the brisket back on the belt and put the bone on an overhead belt; she estimated she performed about 12 deboning processes per hour.

During Dr. Carabetta's evaluation, Lopez reported that on January 2, 2020, she experienced a "popping sensation" and swelling in her right shoulder while deboning "'all-natural'" briskets. Lopez explained to Dr. Carabetta that natural beef without preservatives "made the deboning process particularly difficult and required considerable force." She estimated natural briskets required twice as much physical force as nonnatural briskets.

Lopez testified that she had not previously reported the pop in her shoulder because Dr. Carabetta was the first person who asked about it. She did not know it was relevant until Dr. Carabetta asked her.

5

Dr. Carabetta opined that Lopez' two weeks of repetitive activity was not the prevailing factor for her torn rotator cuff. However, Dr. Carabetta wrote: "[I]f any of the previous physicians . . . had investigated her history properly, they would have learned . . . that this injury actually dates back to a particular incident that occurred on January 2, 2020." Accordingly, Dr. Carabetta concluded: "In short, repetitive trauma is not the mechanism by which we cause a full-thickness rotator cuff tear, but rather a specific incident as occurred on January 2, 2020[,] at work with this employer." Dr. Carabetta assigned a 4% whole person impairment to Lopez' myofascial injuries and a 9% whole person impairment to Lopez' rotator cuff tear, for a 13% overall whole person impairment.

On May 11, 2022, Lopez again amended her application for benefits. Although she still claimed repetitive brisket deboning as the cause of injury, she changed the date of injury to January 2, 2020.

*Conflicting Testimony*

During a preliminary hearing, Lopez testified that she deboned briskets for eight hours per day for two weeks, though she said it was possible she performed the job for less than eight hours if she received help on the brisket line. Lopez said bone-in briskets weighed about 30 pounds, but the heavier briskets weighed up to 50 pounds. She later testified that the normal range was 30-40 pounds. She also explained that she used her hook to grab the brisket with her left hand and her knife to cut the bone from the brisket with her right hand, though she would switch and grab the brisket with her right hand if it was too far away on the belt or if the belt moved too fast. Although Dr. Carabetta understood that Lopez deboned briskets at chest level, Lopez testified that she deboned briskets about two inches above her belt line.

6

Lopez also testified to deboning natural and nonnatural briskets. She claimed natural briskets were "a little bit more difficult" and "very firmly closed in" because they were not injected with $CO_2$. According to Lopez, National Beef did not inject $CO_2$ into pieces of chuck that were attached to the briskets because the $CO_2$ would break open the bags containing the chuck. Therefore, "the brisket does not get any $CO_2$. So mostly the brisket is completely shut." She also claimed that natural briskets were typically "a lot bigger" than nonnatural briskets.

Saenz, the supervisor to whom Lopez first reported her chest pain, testified that because Lopez was not a qualified brisket deboner, she would have deboned briskets for only four hours in an eight-hour shift and would not have worked at full count with the other employees on the line. Lopez disagreed with these claims. Saenz also testified that most bone-in briskets weigh 25-30 pounds, but he had never seen a brisket heavier than 30 pounds. He further stated that because employees have a shorter and a longer hook to grab briskets off the belt, it was "highly unlikely" that employees would use their knife hand to grab briskets.

Saenz also disputed Lopez' representation of natural briskets. He testified that National Beef injects $CO_2$ into both natural and nonnatural briskets to facilitate separating the meat from the bone. Lopez, however, disagreed with this claim. Saenz claimed deboning a natural brisket was no more difficult than deboning a nonnatural brisket.

Armando Barboza, assistant fabrication manager at National Beef, also testified that Lopez would not have deboned briskets at full count with the other employees. He estimated most briskets weighed 15-20 pounds and disagreed that they would weigh 50 pounds. Barboza also said it was uncommon for employees to grab briskets too far away on the belt with their knife hand. He further claimed that if deboning briskets at waist level, Lopez "would just like bend over and get the piece, but she wouldn't have to reach for it, especially with her right hand."

Like Saenz, Barboza testified that National Beef injects $CO_2$ into all beef and deboning natural brisket was no different than nonnatural brisket. He also said that chuck is injected with $CO_2$ and, although it is originally attached to the brisket, the two pieces go to separate belts for deboning. When asked about Lopez' claim that chuck is not injected with $CO_2$ because it would break open the bag, Barboza believed she was referring to the sealed bags National Beef uses for packaging. However, he said the meat goes to packaging after being deboned; it does not have a bag on it at the deboning stage.

*ALJ Ruling*

The ALJ found Lopez' myofascial injuries were work-related, but her torn rotator cuff was not. The ALJ explained that two out of three doctors found repetitive brisket deboning would not have caused a rotator cuff tear. Considering Lopez' explanation of her injury to Dr. Carabetta, the ALJ stated: "Bottom line, there were too many different stories. There was no reasoned, credible way for the court to decide if, or how, the claimant injured her shoulder in the course and scope of employment." The ALJ found Lopez had a 4% whole person impairment. The ALJ also found National Beef not liable for Lopez' medical expenses relating to her lymphadenopathy and rotator cuff and denied future medical benefits. The ALJ ordered National Beef to pay authorized medical expenses and to pay $11,055.60 in permanent partial disability benefits. Lopez applied for review of the ALJ's award to the Board.

*Board Ruling*

The Board modified the ALJ's order. The Board found Lopez' work deboning briskets was the prevailing factor for both her rotator cuff and myofascial injuries. The Board found Dr. Carabetta—as the neutral physician—most credible and highlighted that he found Lopez' work was the prevailing factor for her injuries. The Board acknowledged the conflicting testimony on the manner Lopez performed the deboning work, how many

8

hours each day she spent deboning, and whether natural beef was harder to debone than nonnatural beef. The Board conveyed, however, that these disputes did not "overcome the proven facts [Lopez] was injured as [a] result of deboning briskets for two weeks, a task she did not usually perform, was repetitive and according to two medical experts was competent to cause her injuries." The Board then explained: "[Lopez'] testimony, not artful at times, was an attempt to convince her employer, when confronted with an immediate denial of her injuries, to explain why or how she was injured."

National Beef filed a petition for judicial review.

ANALYSIS

I.    THE BOARD'S ORDER WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

*Standard of Review*

When determining fact questions, an appellate court's responsibility is to review the record as a whole to determine whether substantial evidence supports the Board's factual determinations. K.S.A. 77-621(c)(7). We "(1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. [We do] not reweigh the evidence or engage in de novo review." *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014); see K.S.A. 77-621(d).

> "Substantial evidence is evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing a substantiating basis of fact from which the issue tendered can be reasonably resolved. This court views the evidence in the light most favorable to the prevailing

9

party; it does not reweigh the evidence or determine the credibility of the witnesses."
*Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 16-17, 81 P.3d 425 (2003).

After reviewing all the evidence, we must determine "whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that it is insufficient to support its decision." *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 138, 343 P.3d 114 (2015).

*Analysis*

On appeal, National Beef challenges the Board's order regarding Lopez' injuries, arguing that the Board's findings are not supported by substantial evidence.

A. *Kansas statutes distinguish between injuries by accident and injuries by repetitive trauma.*

In Kansas, "[a]n injury is compensable only if it arises out of and in the course of employment. . . . An injury is not compensable solely because it aggravates, accelerates or exacerbates a preexisting condition or renders a preexisting condition symptomatic." K.S.A. 2019 Supp. 44-508(f)(2). Here, because Lopez' injury occurred in December 2019 through January 2020, we refer to the statutes in effect at the time of her injury.

An "'[a]ccident'" is defined as "an undesigned, sudden and unexpected traumatic event, usually of an afflictive or unfortunate nature and often, but not necessarily, accompanied by a manifestation of force." K.S.A. 2019 Supp. 44-508(d). An accident (1) "shall be identifiable by time and place of occurrence, produce at the time symptoms of an injury and occur during a single work shift"; (2) "must be the prevailing factor in causing the injury"; and (3) "shall in no case be construed to include repetitive trauma in any form." K.S.A. 2019 Supp. 44-508(d).

10

An accident arises out of employment when "(i) [t]here is a causal connection between the conditions under which the work is required to be performed and the resulting accident; and (ii) the accident is the prevailing factor causing the injury, medical condition and resulting disability or impairment." K.S.A. 2019 Supp. 44-508(f)(2)(B). "Repetitive trauma refers to cases where an injury occurs as a result of repetitive use, cumulative traumas or microtraumas. The repetitive nature of the injury must be demonstrated by diagnostic or clinical tests. The repetitive trauma must be the prevailing factor in causing the injury." K.S.A. 2019 Supp. 44-508(e).

A repetitive trauma arises out of employment only if:

"(i) The employment exposed the worker to an increased risk or hazard to which the worker would not have been exposed in normal non-employment life;

"(ii) the increased risk or hazard to which the employment exposed the worker is the prevailing factor in causing the repetitive trauma; and

"(iii) the repetitive trauma is the prevailing factor in causing both the medical condition and resulting disability or impairment." K.S.A. 2019 Supp. 44-508(f)(2)(A).

B.      *We review the record to determine whether there was substantial evidence to support the rotator cuff injury.*

National Beef claims the Board's finding that Lopez suffered a work-related rotator cuff tear was not supported by substantial evidence. Lopez initially denied having a work-related accident or injury during her visits with Briggs. National Beef highlights that Lopez alleged an injury by repetitive trauma, and two out of three doctors concluded that the repetitive deboning activity was not the prevailing factor for the rotator cuff tear. And despite Dr. Murati's opinion that the repetitive deboning activity was the prevailing factor, National Beef further argues that "the weight of the credible evidence" shows that repetitive activity was not the prevailing factor.

11

Lopez argues that National Beef is asking us to reweigh the evidence in its favor. Her testimony, she notes, was corroborated by Dr. Carabetta's opinion that deboning brisket was the prevailing factor in her shoulder injury. Dr. Murati also opined that the repetitive activity was the prevailing factor in her shoulder injury. Lopez further highlights that Dr. Carabetta did not change his opinion after hearing of Saenz' testimony.

C.  *We consider the Board's findings regarding Lopez' rotator cuff injury.*

Our review of the record shows that Lopez claimed a work-related injury by repetitive deboning activity experienced on January 2, 2020. Although Dr. Hufford concluded that Lopez' work was not the prevailing factor for her torn rotator cuff, Dr. Murati believed the two weeks of deboning briskets was the prevailing factor. And Dr. Carabetta did not think Lopez' repetitive activities caused her torn rotator cuff, but the pop in her shoulder while deboning briskets on January 2, 2020, was the prevailing factor.

Taking a closer look at Dr. Murati's opinion, he did not change his opinion that the two weeks of deboning was the prevailing factor after being advised of the pop in Lopez' shoulder. He believed the process likely started in late December 2019 and culminated in a "frank tear" with the pop in her shoulder. Based on his experience treating workers in the meat packing industry, Dr. Murati believed Lopez suffered a "very common injury" for meat packing workers. Specifically, with 30-pound briskets, he opined that if "you lift it enough times, you're going to develop a problem." Dr. Murati further testified that because Lopez did not regularly debone briskets, which requires "a lot of force," deboning briskets could cause a rotator cuff tear to Lopez' right shoulder even if she pulled briskets off the belt with her left hand. Dr. Murati stated that given the frequency of rotator cuff tears in the meat packing industry, the only way he could change his opinion was if there was documentation of another cause of injury.

12

Likewise, Dr. Carabetta's opinion was unaffected by the contradictory testimony regarding natural and nonnatural briskets. When asked if he could still say deboning brisket was the prevailing factor if natural brisket was the same as nonnatural brisket, Dr. Carabetta responded: "I think we still can, because that is when she said she felt the pop and experienced the pain. Her reasoning behind it may not be correct but it's still the time when it happened."

The Board found Dr. Carabetta most credible in finding Lopez' rotator cuff injury compensable. The Board acknowledged the conflicting testimony in the case but concluded any contradictory testimony did not outweigh the "proven facts" that Lopez was injured from deboning briskets for two weeks.

D.    *We consider whether there was substantial evidence to support the myofascial injuries.*

National Beef also asserts that the Board's order finding Lopez' myofascial injuries compensable was not supported by substantial evidence. National Beef claims that after finding out Lopez deboned briskets at waist level rather than chest level, Dr. Carabetta could not say with reasonable medical certainty that work was the prevailing factor for Lopez' myofascial injuries. National Beef suggests that although Dr. Murati found deboning briskets was the prevailing factor for the myofascial injuries, Dr. Carabetta's opinion should receive more weight as the neutral doctor.

Lopez responds that Dr. Carabetta corroborated Lopez' testimony in concluding deboning briskets was the prevailing factor for her myofascial injuries. Lopez also points to Dr. Murati's opinion that deboning briskets was the prevailing factor and asserts that National Beef asks the panel to reweigh the evidence.

13

Dr. Carabetta and Dr. Murati opined that Lopez' repetitive activity deboning briskets was the prevailing factor for her myofascial injuries. Dr. Carabetta initially understood that Lopez deboned briskets at chest level. However, Lopez later testified that she deboned briskets at waist level.

When informed of Lopez' testimony, Dr. Carabetta could not say "with certainty" that deboning briskets at waist level for two weeks caused Lopez' myofascial injuries. He agreed that deboning briskets at waist level was less likely to cause a myofascial injury than deboning at chest level. Dr. Carabetta also sought clarification on the topic: "How far across the table does she have to reach to grab the pieces of meat? If she has to do that frequently and has to reach out well in front of herself then it can [cause a myofascial injury]." Dr. Carabetta later confirmed that in light of all the information he had received, he still believed work was the cause of Lopez' myofascial injuries. As noted previously, the Board found Dr. Carabetta most credible as the neutral doctor.

The Board weighed the evidence of how Lopez deboned briskets and the medical opinions on Lopez' myofascial injuries. Dr. Murati believed work was the prevailing factor. Dr. Carabetta appeared to waiver after finding out Lopez deboned briskets at chest level, though he later said his opinion was still that work caused Lopez' myofascial injuries. The Board relied on this evidence in finding Lopez' myofascial injuries compensable.

E.    *Conflicting Evidence in Other Cases*

Multiple panels of this court have reviewed workers compensation claims involving conflicting evidence and medical opinions. For example, in *Pierson v. City of Topeka*, No. 113,247, 2016 WL 687726 (Kan. App. 2016) (unpublished opinion), the panel surmised that the appellant, the City of Topeka, was challenging the Board's decision by asking it to reweigh the evidence by crediting the City's doctor more than the

14

other two doctors. There, Pierson went to work with a stiff neck for a job requiring considerable manual labor. He developed pain and numbness from the waist up after work and was diagnosed with radiculopathy. Both Pierson's doctor and the neutral doctor concluded work was the prevailing factor for his condition, while the City's doctor opined the prevailing factor was degenerative changes in Pierson's spine. The panel noted that three doctors relied on the same information, stating that no doctor gave an opinion "so outlandish or irreconcilable with the available evidence that it could be discarded as utterly unfounded." 2016 WL 687726, at *3. The Board found work was the prevailing factor, noting that radiculopathy was unlike any of Pierson's earlier back conditions.

More recently, in *Langvardt v. Innovative Livestock Svcs*, No. 125,517, 2023 WL 4278893 (Kan. App. 2023) (unpublished opinion), Langvardt injured his back in a fall at work. Two months later, he became unable to walk. Due to Langvardt's preexisting back problems, three doctors found that his work fall was not the prevailing factor in his impairment. Four other doctors, however, opined that the work fall was the prevailing factor. The Board concluded Langvardt's spine herniation causing his impairment would not have happened absent his work accident and found his injury work-related.

On appeal, Innovative Livestock argued that "'more persuasive'" medical opinions found work was not the prevailing factor in Langvardt's impairment. 2023 WL 4278893, at *6. The *Langvardt* panel rejected this argument as reweighing the evidence. The panel affirmed the Board's order, finding the Board weighed the conflicting opinions on Langvardt's preexisting back problems and sided with the doctors who believed the preexisting problems were "'red herrings.'" 2023 WL 4278893, at *6.

Other appellate panels have reversed Board decisions as not supported by substantial evidence where the testimony relied on by the Board was undermined by the evidence. See *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 955-56, 379 P.3d 428 (2016) (finding Board lacked substantial evidence in relying on doctor who did not

examine claimant and in dismissing claimant's testimony over insignificant self-contradiction); *Le v. Armour Eckrich Meats*, 52 Kan. App. 2d 189, 200, 364 P.3d 571 (2015) (finding Board's decision lacked substantial evidence in relying on medical testimony undermined by severity of claimant's injury).

### 1. *Application to Lopez' Case*

Similar to the cases described above, this case contained instances of conflicting evidence and medical opinions. Despite the conflicting testimony from Lopez, Saenz, and Barboza on the process of deboning briskets, the doctors' opinions on the prevailing factor for Lopez' torn rotator cuff remained unchanged. The Board weighed the evidence and medical opinions and found Dr. Carabetta most credible as the neutral doctor. National Beef's argument asks us to reweigh the evidence by crediting some medical testimony over other testimony. This goes beyond the appellate scope of review. See *Williams*, 299 Kan. at 795.

Additionally, in reversing the Board's order and finding the employee's injury work-related, the *Buchanan* panel highlighted that there was no evidence of other causes of injury. 52 Kan. App. 2d at 956. Likewise, in this case, no evidence suggested a cause of Lopez' rotator cuff injury or her myofascial injuries other than deboning briskets. Accordingly, the Board's order regarding Lopez' work-related injuries was supported by substantial evidence.

### 2. *Extent of Lopez' Impairment*

Finding Lopez had work-related rotator cuff and myofascial injuries, the Board adopted Dr. Carabetta's findings that Lopez had a 13% permanent whole person impairment. Dr. Carabetta reached this figure after concluding that Lopez had a 4%

whole person impairment from the myofascial injuries and a 9% whole person impairment from the rotator cuff injury.

National Beef appears to stipulate to Dr. Carabetta's calculation of Lopez' impairment but argues that because Lopez did not suffer work-related injuries, she should not be compensated for any impairment. We are not persuaded and conclude that Lopez suffered both work-related myofascial injuries and a work-related rotator cuff tear. We affirm the Board's finding on the extent of Lopez' impairment.

## II.   LOPEZ GAVE TIMELY NOTICE OF AN INJURY BY ACCIDENT TO HER ROTATOR CUFF

National Beef concedes that it had timely notice of an injury by repetitive trauma as of January 21, 2020. However, National Beef asserts the weight of the evidence shows Lopez suffered an injury by accident. National Beef claims it had no notice of an injury by accident until 17 months after the accident. National Beef suggests that "[b]y the most-expansive reading of K.S.A. 44-520(a)(1), Lopez has not given timely notice."

Lopez responds that while the Board did not address timely notice, it impliedly found Lopez gave timely notice by finding her rotator cuff injury compensable. Lopez also asserts that the "evidence clearly establishes claimant informed respondent she was claiming a work-related injury to her right shoulder by January 21, 2020, at the latest." Lopez suggests this notice satisfied the timely notice requirement.

*Standard of Review*

"An appellate court's scope of review of questions of fact in a workers compensation case is limited to whether the Board's findings of fact are supported by substantial competent evidence." *Myers v. Lincoln Center Ob/Gyn*, 39 Kan. App. 2d 372, 375, 180 P.3d 584 (2008).

17

*Analysis*

An employee must provide notice to the employer of a work-related injury by accident or repetitive trauma within 20 calendar days from the date of accident or repetitive injury or 20 calendar days from the date treatment is sought, whichever is earlier. K.S.A. 2019 Supp. 44-520(a)(1)(A)-(B). The notice requirement is waived if the employer had actual knowledge of the injury. K.S.A. 2019 Supp. 44-520(b)(1).

On January 21, 2020, Lopez reported to Briggs that she wanted to pursue a workers compensation case, believing her injuries resulted from deboning briskets for two weeks. She deboned briskets from December 20, 2019, until she went to the emergency room on January 3, 2020. On June 22, 2021, Lopez reported to Dr. Carabetta that she felt a popping sensation while deboning briskets on January 2, 2020. Dr. Carabetta concluded the particular January 2, 2020 accident was the prevailing factor for Lopez' rotator cuff injury. Dr. Murati opined that Lopez suffered a repetitive rotator cuff injury from deboning briskets for two weeks. Dr. Murati did not change his opinion after learning of the pop in Lopez' shoulder.

The ALJ found Lopez gave notice of an injury by repetitive trauma on January 21, 2020. It further found Lopez' notice was within 20 days of the repetitive injury dates as defined in K.S.A. 2019 Supp. 44-508(e). Therefore, the ALJ concluded Lopez gave timely notice of an injury by repetitive trauma.

In its brief to the Board, National Beef argued that Lopez failed to give timely notice of a rotator cuff injury in a January 2, 2020 accident. The Board found that Lopez reported her injury as work-related to the company nurse on January 22, 2020. While the Board did not make an explicit finding on when Lopez' rotator cuff injury occurred or address whether Lopez gave timely notice, the Board impliedly found Lopez' rotator cuff injury occurred on January 2, 2020, based on its acceptance of Dr. Carabetta's opinion.

K.S.A. 77-621(c)(7) allows courts to grant relief when "the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof . . . ." Thus, we may rule on decisions based on implied factual findings by the Board.

In *Baldwin v. Jensen-Salsbery Laboratories*, 10 Kan. App. 2d 673, 708 P.2d 556 (1985), Jensen-Salsbery claimed it was prejudiced when Baldwin initially made a workers compensation claim for occupational disease but his claim was later adjudicated as an accidental injury. On appeal, the panel noted that the purpose of the notice requirement was to allow the employer the chance to investigate the injury and provide treatment. The panel further concluded that Jensen-Salsbery would have presented the same defense whether Baldwin reported the injury as an occupational disease or an accident. Therefore, the panel found Jensen-Salsbery was not prejudiced. 10 Kan. App. 2d at 675.

More recent cases focus on whether the employee reported the injury as work-related rather than the mechanism of the injury. For example, in *Eder v. Hendrick Toyota*, No. 114,824, 2016 WL 7324454 (Kan. App. 2016) (unpublished opinion), when Eder began feeling pain in his neck, he reported the injury to Hendrick and said he did not know what could have caused the injury other than work. Eder did not know what caused the pain. The panel found this notice and a subsequent accident report Eder filled out at work was sufficient to give Hendrick actual knowledge of a work-related injury. The panel highlighted that "Eder's actions served the purpose of the notice requirement [which is] to give the employer an opportunity to investigate the accident or injury and provide medical treatment." 2016 WL 7324454, at *8. Accordingly, the panel affirmed the Board's finding that Hendrick had proper notice of the injury. 2016 WL 7324454, at *8; see also *Brooks v. Kincaid Coach Lines, Inc.*, No. 117,542, 2017 WL 4558226, at *3 (Kan. App. 2017) (unpublished opinion) (finding "the notice provision of K.S.A. 2016 Supp. 44-520 requires notice of injury, as opposed to notice of accident").

Given that the purpose of the notice requirement is to allow the employer to investigate the employee's injury and provide treatment, it follows from these cases that Lopez' report of a work-related injury in January 2020 was sufficient notice. Similar to *Eder*, Lopez initially was not sure of the cause of her injury. She ultimately suspected her injury was work-related and reported as much to National Beef to allow National Beef to investigate the injury. Lopez stated she did not initially report a pop in her shoulder because she did not know it was relevant and was not asked about it. Furthermore, as the *Brooks* panel noted, employees must give notice of injuries, rather than accidents. 2017 WL 4558226, at *3. Therefore, Lopez' report of a work-related injury in January 2020 satisfied the purpose of the notice requirement, and National Beef had proper notice of her rotator cuff injury.

III.   THE BOARD DID NOT MISAPPLY OR MISINTERPRET THE LAW IN FINDING NATIONAL BEEF RESPONSIBLE FOR MEDICAL BILLS

National Beef argues that because none of the treatment Lopez sought for her rotator cuff was authorized, it should not be liable for those expenses. National Beef contends that Lopez should have sought a court order for her rotator cuff treatment. National Beef further claims that it denied Lopez' workers compensation claim in good faith based on the information she provided and medical opinions, after which she sought further treatment. National Beef conveys it "was denied the opportunity to investigate Lopez's claim and direct her medical treatment solely due to her failure to timely and accurately report how her accident allegedly occurred." Accordingly, National Beef claims it should not be required to reimburse Lopez for her treatment.

Lopez responds that National Beef's deferral to Dr. Hufford's opinion in denying her workers compensation claim did not relieve it of its duty to pay for her treatment.

20

*Standard of Review*

When the appellant argues the Board erroneously applied the law to undisputed facts, appellate courts exercise de novo review. *Mera-Hernandez v. U.S.D. 233*, 305 Kan. 1182, 1185, 390 P.3d 875 (2017).

*Analysis*

Employers are required to provide injured employees with healthcare services "as may be reasonably necessary to cure and relieve the employee from the effects of the injury." K.S.A. 2019 Supp. 44-510h(a).

If an employee seeks healthcare services for "examination, diagnosis or treatment" without the employer's approval, the employer is only liable for reimbursement up to $500. K.S.A. 2019 Supp. 44-510h(b)(2). However, "[i]f the employer has knowledge of the injury and refuses or neglects to reasonably provide the services of a health care provider required by this act, the employee may provide the same for such employee, and the employer shall be liable for such expenses . . . ." K.S.A. 2019 Supp. 44-510j(h).

Lopez informed her supervisor of pain in her right breast on January 3, 2020. Briggs became aware of Lopez' torn rotator cuff on January 14, 2020. Lopez reported her injuries as work-related on January 21, 2020, although National Beef deemed her injuries nonwork-related in February 2020.

Lopez sought reimbursement for $25,171.66 in medical bills from Southwest Medical Center for unauthorized treatment received between January 3, 2020, and June 2, 2020. The ALJ found National Beef not liable for these expenses as it found Lopez' rotator cuff injury not work-related. The Board reversed and found National Beef liable for such expenses.

Our Supreme Court considered reimbursement for unauthorized medical bills in *Saylor v. Westar Energy, Inc.*, 292 Kan. 610, 256 P.3d 828 (2011). There, after suffering a work-related injury, Saylor underwent knee replacement surgery. He was awarded reimbursement for his medical bills after the Board found Westar knew about his injury but failed to provide treatment. On appeal, Westar argued that if Saylor wanted treatment not provided by Westar, he had to apply for a preliminary hearing under K.S.A. 44-534a(a). The *Saylor* court rejected that argument, finding that K.S.A. 44-510j(h) "clearly conveys the message that if Westar knew that its employee was suffering from a work-related injury and refused or neglected to provide medical services to address that injury, the employee was permitted to provide his or her own doctor at Westar's expense." 292 Kan. at 623. The court believed Westar's "real complaint" was that it did not have notice of a work-related injury until after Saylor received treatment. 292 Kan. at 623. However, the Board found Westar had notice, and the evidence supported such a conclusion. 292 Kan. at 623.

Another panel of this court addressed a similar issue in *Van Horn v. Blue Sky Satellite Svcs*, No. 122,888, 2021 WL 3124167 (Kan. App. 2021) (unpublished opinion). There, Van Horn suffered a knee injury at work. Blue Sky disputed whether the injury was work-related. Van Horn received unauthorized treatment and was awarded reimbursement by the ALJ and the Board. On appeal, Blue Sky claimed because Van Horn's treatment was unauthorized, it should only be liable for $500 of his treatment. Blue Sky further argued that to receive authorized treatment, Van Horn should have sought a preliminary hearing or a court order for such treatment. Following *Saylor*, the panel rejected that argument. *Van Horn*, 2021 WL 3124167, at *10.

The panel further explained: "Here, Blue Sky would presumably assert that it knew of the injury, it simply did not believe it to be work-related, making its case distinguishable from *Saylor*. But Blue Sky does not cite *Saylor* to argue a different result." 2021 WL 3124167, at *10. Additionally, the panel highlighted that Blue Sky

cited no authority for "the idea that an injured employee is required to wait until an ALJ has ordered authorization of treatment before he or she may seek treatment for an injury." 2021 WL 3124167, at *10; see *Langvardt*, 2023 WL 4278893, at *11 ("The injured employee does not need to show more than that the employer knew of the injury before receiving treatment. The plain text of K.S.A. 44-510j[h] does not require the employee to wait for a determination of a compensable work-related injury before treating the condition.").

Here, National Beef claims Lopez should have applied for a court order to receive authorized treatment. As the cases above demonstrate, courts have rejected that argument, finding no requirement for an employee to delay treatment before receiving a court order or other remedy. Accordingly, National Beef's argument fails.

National Beef knew of Lopez' injury but did not provide treatment. National Beef asserts it relied on Dr. Hufford's opinion in good faith and was prepared to authorize medical treatment if Dr. Hufford deemed Lopez' injuries work-related. However, the *Van Horn* and *Langvardt* panels did not find such an argument persuasive. As the *Langvardt* panel pointed out, K.S.A. 44-510j(h) does not require employees to delay treatment until employers find an injury compensable. 2023 WL 4278893, at *11. Therefore, National Beef's determination that Lopez' injuries were not work-related does not bar reimbursement for treatment of those injuries.

Accordingly, the Board did not err in finding National Beef responsible for Lopez' medical bills.

Affirmed.